IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

LEE KNOWLIN,

                        Plaintiff,                          OPINION and ORDER

                v.                                          09-cv-531-wmc[1]

JULIANNE WURL-KOTH, Program
Services Director, Department of Corrections;
MARK HEISE, Corrections Services
Manager, Bureau of Offender Classification
and Movement; GERALD KONITZER,
Sector Chief, Bureau of Offender Classification
and Movement;

                        Defendants.

---

State prisoner Lee Knowlin brings this lawsuit pursuant to 42 U.S.C. § 1983, claiming that defendants Julianne Wurl-Koth, Mark Heise and Gerald Konitzer violated his right to substantive due process by forcing him to participate in unnecessary alcohol and drug treatment. The parties cross move for summary judgment. Dkt. ## 28 and 37. Knowlin presents the outline of a story worthy of Joseph Heller, raising a number of legitimate questions about the scope of a prisoner's right to refuse different forms of treatment, though most need not be answered to resolve the parties' summary judgment motions. This is because the current uncertainty as to a prisoner's legal right to refuse treatment for a perceived addiction prevents Knowlin's claim for damages to proceed in light of defendants' entitlement to qualified immunity. This uncertainty is underscored by Knowlin's failure to present admissible evidence

---

[1] This case was reassigned pursuant to a March 31, 2010 administrative order.

regarding the content of the required treatment program at issue.  Moreover, the evidence ultimately establishes that none of the named defendants were involved in requiring Knowlin to participate in treatment or punishing him for refusing to do so, much less that they did so with deliberate indifference.  Since these defects are fatal to Knowlin's civil rights claim, defendants' motion will be granted and plaintiff's denied.

UNDISPUTED FACTS[2]

1.     Background

In December 1999, plaintiff Lee Knowlin was convicted of burglary and sentenced to prison for 20 years.  When prisoners enter the Wisconsin Department of Corrections, they receive an initial "assessment and evaluation" to determine their security classification and program assignments.  In May 2000, as part of his assessment and evaluation, Knowlin was given a "substance abuse subtle screening inventory" to determine whether he needed alcohol or drug treatment. The classification specialist administering the test reached this conclusion: "The profile does not contain sufficient evidence to warrant classifying the client as substance dependent. If there is external evidence of substance misuse, it is recommended that the client be referred to an education program."  In a later "inmate classification summary," dated May 18, 2000, an unidentified staff member listed "AODA" as a "previous A&E need" that "remains an unmet prog[ram] need" for Knowlin.  At Knowlin's classification hearing on the same day, the classification specialist recommended Knowlin for "AODA Level 5-B-COGN."  Defendant

_____

[2]  From the parties' proposed findings of fact and the record viewed in a light most favorable to pro se plaintiff Knowlin, the court finds that the following facts are undisputed.

Mark Heise is the director for the Department of Corrections' Bureau of Offender Classification and Movement.

The Wisconsin Department of Corrections runs its own Alcohol and Other Drug Abuse treatment program for prisoners. The main goal of the program is to "promote changes in attitude and behaviors that will assist inmates in drug and alcohol free reintegration into the community."  Refusal to participate in the program is one of fourteen factors that may be considered in assigning a custody classification under Wis. Admin. Code § DOC 302.07(10). Custody classification may affect institution placement.  In addition, the parole commission may deny presumptive mandatory release to a prisoner if he "refus[es] . . . to participate in counseling or treatment that the social service and clinical staff of the institution determines is necessary for the inmate." Wis. Stat. § 302.11(1)(b)2.  Because Knowlin was charged with a serious felony between 1994 and 1999, his mandatory release date (August 2013) is "presumptive."

In November 2000, Knowlin was scheduled to enter the "Nexus Alcohol and Other Drug Abuse" program, beginning in July 2001.  In March 2001 and March 2002, the program review committee noted that Knowlin had refused AODA treatment.  As a result, the committee rated his program participation as "moderate" on  his "Inmate Risk Assessment."

At Knowlin's hearing before the program review committee in March of 2006, Knowlin stated that he did not need AODA treatment, but he "will take it if [he is] recommended for it." The committee reduced his rating to "low" on his "Inmate Risk Assessment for program participation."  At that point, the matter seemed resolved with Knowlin being slotted for treatment.

2.     Efforts to Enroll Knowlin in AODA Treatment

Two years later, however, the issue of Knowlin's need to undergo AODA treatment resurfaced, beginning six months of inconsistent actions and reactions by DOC and Knowlin. In March 2008, the parole commission denied Knowlin parole.  One of the reasons given was that Knowlin's program participation had not been "satisfactory." The commission wrote that "[s]uccessful completion" of AODA treatment "is required."

Obviously motivated to complete treatment, Knowlin asked at a program review committing hearing on April 10, 2008, to be transferred to a prison where he could receive AODA treatment.  On April 23,  Knowlin was instead transferred to the Flambeau Correctional Center, where the AODA program was apparently unavailable.

On May 16, Knowlin filed a document called "Appeal of Assessment and Evaluation (A&E) or Program Review (PR) Decision." He wrote:

> I am asking for community custody and a transfer to Sanger B. Powers or Kenosha Correctional Center until my time to projected release makes me eligible to start AODA.  Alternatively, I am asking that AODA be terminated as a need for me and that I still be transferred to one of the above correctional centers.

In a memorandum called "AODA Residential Treatment Program" dated May 21, Knowlin was informed that he had "been identified as having a rehabilitative program need and slotted for the AODA Residential Treatment Program. . . . A refusal to take this treatment program may affect your eligibility for work assignments and will be noted in your file." Knowlin put an "X" in the box next to the statement, "Yes, I will participate."

In a letter dated July 3, Knowlin seems to backtrack (perhaps because of further delays by DOC in enrolling him in treatment, though the record is unclear) asking defendant Julianne Wurl-Koth, the officer of program services for the Division of Adult Institutions, to "terminate

4

AODA as a need for me. . . . I believe that [Dodge Correctional Institution] arbitrarily assigned AODA to me because I have no history of alcohol and drug abuse. An AODA counselor has not evaluated me."  Wurl-Koth responded in a letter dated July 21 that she was "not willing to consider removing [his] AODA program need" because "[a]ccording to [his] Pre-sentence Investigation dated July 27, 2000 you refused to sign a Confidential Release of Information allowing the agent access to any previous AODA assessments, treatment recommendations and/or program experiences."  Knowlin replied on August 6 that he had "denied the agent [who prepared the presentence report] access to my Department of Corrections file regarding the [AODA] information," but that he "did sign the release after the PSI was submitted to the trial court."  In addition, he wrote that Wurl-Koth had access to his confidential files.[3]

3.    AODA Treatment

On August 11, 2008, the matter again appeared resolved with Knowlin's enrollment in the AODA program.  Defendant Gerald Konitzer, the classification section chief for the Bureau of Offender Classification and Movement, concluded on August 27, 2008, that there was "no cause to move as [Knowlin was] at a site that offers programming."

On September 15, 2008, however, Knowlin again asked defendant Konitzer to reconsider his decision and to "terminate AODA as a need for me" because "I have no alcohol and drug abuse history."  Perhaps in response to this request or to an unrelated disciplinary action brought against Knowlin (again the record is unclear), he was transferred to another prison on September 18, 2008, and was terminated from the AODA program as a result.  Adding to the confusion,

––––––––––––––––––––––

[3]  The parties dispute whether Wurl-Koth sent Knowlin a response to that letter.

Knowlin asked at a later program review committee hearing that he be transferred to a prison where he could receive AODA treatment.

In a decision dated December 14, 2008, defendant Konitzer formally denied Knowlin's request to reconsider his decision requiring treatment. As a reason for his decision, Konitzer marked the box next to "professional recommendations by other departments." In addition, he wrote:

> "Your interest in FCC placement was for AODA. The change in posture you have is suspect[.] [C]onfer with SW regarding AODA assignment and case plan. I am not moved to vacate the AODA assignment."

In April 2009, Knowlin was transferred to Jackson Correctional Center and scheduled to participate in the AODA program beginning on October 26. On August 24, 2009, Knowlin filed suit challenging the treatment requirement in this court. On September 17, the court granted Knowlin leave to proceed on his claim that defendants Wurl-Koth, Heise and Konitzer "violated his right to due process by requiring him to participate in drug and alcohol treatment."

Knowlin was interviewed by Melinda Derus, a unit manager at the Jackson prison, for the purpose of determining his need for alcohol or drug treatment. In a fitting ending (one hopes), Derus concluded on October 19, 2009, that

> "[T]here is no clear distinctions to state that he has had any history of misuse or abuse. There is no documentation of use or misuse. Mr. Knowlin[']s offenses are not related to drug or alcohol abuse."

Derus, therefore, removed AODA as treatment need for Knowlin.


OPINION

For almost 10 years, Lee Knowlin tried unsuccessfully to convince the Wisconsin

Department of Corrections that he did not need drug or alcohol treatment. A classification specialist initially agreed with him, but for reasons that are still unclear, an unidentified staff member recommended plaintiff for treatment. An unfortunate series of events followed. When plaintiff refused treatment on the ground that he did not have a drug or alcohol drug addiction, he was told that he could not be paroled without receiving treatment. When he relented and agreed to participate, he was prevented from completing the program, again for reasons that are not clear. Plaintiff was caught in a catch-22, seemingly without any way to resolve the problem. It is understandable, then, that Knowlin is frustrated by the Wisconsin Department of Corrections' failure to correct its own mistake or even give Knowlin a way to correct it himself.

While the undisputed facts may show that prison staff made a number of mistakes and questionable decisions, this does not mean that Knowlin is entitled to relief under 42 U.S.C. § 1983. Plaintiff does not argue that defendants violated his rights by failing to provide him with treatment, perhaps because he recognizes that prisoners do not have such a right. *Stanley v. Litscher*, 213 F.3d 340, 342 (7th Cir. 2000) (no right to participate in rehabilitation program for sexual offenders); *Higgason v. Farley*, 83 F.3d 807, 809 (7th Cir. 1996) (no right to participate in educational programs, even where participation might lead to accrual of good time credits). Instead, his claim is that defendants violated his constitutional rights by forcing him to participate in alcohol and drug treatment that he did not need. Unfortunately for Knowlin, however, he cannot succeed on that claim either. Although the court is sympathetic to Knowlin's situation, there are a number problems with his claim, both factual and legal, that he simply cannot overcome.

7

I.      **Right to Refuse Treatment**

A threshold question is whether prisoners have a constitutional right to refuse alcohol or drug treatment.  There appears no straightforward answer to that question, at least under the circumstances presented on this record, and that uncertainty alsone is fatal to much of Knowlin's claim for damages.

The Supreme Court has only considered a prisoner's constitutional right to refuse certain forms of treatment once, in *Washington v. Harper*, 494 U.S. 210 (1990).  The Court held in *Washington* that prisoners "posses[s] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221-22.  This right includes certain procedural protections the government must provide before subjecting prisoners to these drugs, as well as a substantive limitation on the government's ability to administer them regardless of the procedures used. *Id.* at 221, 228.

The Court's actual discussion of the issue is brief, but it relied on two other cases to reach its conclusion.  In *Vitek v. Jones*, 445 U.S. 480 (1980), the question was whether a transfer from a prison to a mental hospital implicated the Due Process Clause.  Concluding that it did, the Court stated that the:

> consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of crime. Our cases recognize as much and reflect an understanding that involuntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual. A criminal conviction and sentence of imprisonment extinguish an individuals right to freedom from confinement for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections.

*Vitek v. Jones*, 445 U.S. 480, 493-94  (1980).  In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the

Court concluded that involuntary committed patients retain a right under the Due Process Clause to be free from bodily restraint.

This court has previously interpreted *Washington*, *Vitek* and *Youngberg* to stand for the proposition that prisoners have a "right to be free from unjustified bodily and mental intrusions." *Sundby v. Fiedler*, 827 F. Supp. 2d 580, 583 (W.D. Wis. 1993). More specifically, the court concluded that prisoners have a limited substantive right to refuse participation in a sex offender treatment program, even if it is "carried out without using physical restraints, injections or other bodily intrusions." *Id.*

In the order screening Knowlin's complaint in this case, the court concluded that Knowlin had stated a claim under *Sundby* because he was alleging that "each of the defendants is requiring him to participate in drug and alcohol treatment even though he has no need for such treatment." Sept. 16, 2009 Order, dkt. #5, at 3-4. The court noted, however, that the holding in *Sundby* had been criticized in *Bollig v. Fiedler*, 863 F. Supp. 841, 849 & n.3 (E.D. Wis. 1994), in which Judge Curran concluded that rehabilitative and education programs do not fall under the rubric of *Washington* and *Vitek* because such programs do not subject prisoners "to a greater degree of confinement or to a qualitatively different type of confinement."

Since *Bollig*, as also noted in the September 16 Order, this court also decided *Jones v. Puckett*, 160 F. Supp. 2d 1016 (W.D. Wis. 2001). In that case, the court rejected the argument that a prisoner "has a liberty interest in not being identified in prison records as a person in need of sex offender treatment and in not having a recommendation for participation in treatment programs." *Id.* at 1023 (without citation to *Jones*). In support of that conclusion, Judge Crabb wrote:

It is common for persons entering prison to have an evaluation of the reasons for their criminal behavior and their treatment needs, for the resulting evaluations to be recorded in their records and for the authorities who make programming and parole decisions to base their decisions in whole or in part on their sense of the effort a particular inmate has made to confront the problems that have been identified as contributing to his criminal conduct. Because it is common procedure, plaintiff cannot argue that his evaluation and identification as a person in need of sex offender treatment is the "atypical and significant hardship on the inmate" that creates a liberty interest.

*Jones*, 160 F. Supp. 2d at 1023. *See also Pettigrew v. Frank*, No. 07-CV-690-C, 2008 WL 2610095, *1 (W.D. Wis. Feb. 22, 2008) (following *Jones,* without citing *Sundby*).

In the screening order, the court acknowledged the tension between *Jones* and *Sundby*, but concluded that they are not in direct conflict because *Sundby* addressed the question whether treatment programs implicate the *substantive* due process rights of prisoners while *Jones* was about *procedural* due process.[4]    Further, while recognizing that "both *Bollig* and *Jones* undermine *Sundby,*" the court concluded that a screening order was not the proper vehicle for reconsidering a prior decision.  Dkt. #5, at 3.  Accordingly, the court allowed Knowlin to proceed on a claim that defendants were violating his substantive due process rights.

In their opening summary judgment brief, defendants repeat this court's statement from the screening order that *Sundby* "has been criticized by other courts," but they do not argue that

---

[4]  In his brief Knowlin argues that he was not given "notice" of "the factual basis" for the "diagnosis" that he suffered from "substance dependence/substance abuse." Plt.'s Br. dkt. #38, at 13.  To the extent Knowlin is attempting to raise a claim that defendants failed to provide him constitutionally required procedures, this claims fails because he did not raise it in his complaint and because it is foreclosed by *Jones*. Even if Knowlin had been entitled to receive notice of the reasons behind the conclusion that he needed treatment, the named defendants in this case are not the ones responsible for failing to provide notice.  There is in fact no evidence the defendants were involved in making the initial determination, or of deciding to provide or not provide notice, so none of them would have known whether or not Knowlin was receiving information before that determination was made.

*Sundby* should be overruled.  Instead, they assume that *Sundby* remains good law.  For his part, Knowlin avoids reliance on *Sundby*, arguing instead that *Washington*, *Youngberg* and *Vitek* require a finding that the Due Process Clause is implicated here.  In addition, Knowlin cites *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990), in which the Court stated that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment," including "lifesaving hydration and nutrition," and *Russell v. Richards*, 384 F.3d 444, 447 (7th Cir. 2004), in which the court framed the right as one to "refus[e] unwanted medical treatment" and "assume[d] without deciding" that "instructing new inmates to use a delousing shampoo amounts to involuntary medical treatment."

These cases show that there are several plausible readings of the scope of the Supreme Court's limited precedent on a prisoner's right to refuse different kinds of treatment.  Is the right limited to forms of treatment that impose an "atypical and significant hardship" or are otherwise "qualitatively different" from those that ordinarily accompany a prison sentence, as *Bollig* and *Jones* suggest?  Is it limited to what may be classified appropriately as "medical" treatment, as *Russell* suggests?  Or is any significant "intrusion," whether bodily or mental, enough to trigger the protections of the Due Process Clause, as *Sundby* suggests?  The answer is not obvious and the parties devote little effort to reconciling the cases.[5]

_____

[5] Determining the scope of the right was not dispositive in either *Sundby* and *Russell*, because the courts in both cases concluded that the treatment was reasonably related to legitimate penological interests, which is the standard the Court applied in *Washington*.  In this case, however, the only evidence defendants cite to support a treatment requirement are documents in which a staff member recommended Knowlin for AODA treatment or listed it as a "need" for him.  These documents do not demonstrate the reasonableness of treatment because none of them explain *why* Knowlin needed treatment.  Defendants do not suggest that Knowlin had an alcohol or drug addiction.  Nor do they suggest that it would serve a penological interest to require a prisoner to undergo treatment he did not need.  Thus,

11

This uncertainty dooms plaintiff's claim for damages.  Defendants have raised a defense of "qualified immunity," which is legal jargon for the proposition that a plaintiff may not obtain damages from a public official unless the law was sufficiently clear to give him "fair warning" that he was violating the plaintiffs constitutional rights.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Knowlin is correct that district court decisions such as *Sundby*, *Jones* and *Bollig* cannot clearly establish a constitutional right because they have no precedential authority, *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995), but that does not help him.  In *Anderson*, the court was making the point that plaintiffs cannot rely on district court decisions to overcome a qualified immunity defense.  This does not mean that disagreement among district courts is irrelevant in considering whether the legal pronouncements of the court of appeals or the Supreme Court are sufficiently clear to justify a damage award.  On the contrary, it is strong evidence that the law is not sufficiently clear if courts, much less the lay defendants here, disagree about the law's meaning and application.  Even if these district court decisions are eliminated from the analysis, defendants are still left with a few Supreme Court decisions that do not directly address, and certainly do not answer, whether prisoners have a substantive due process right to refuse alcohol and drug treatment or to be free from adverse consequences to their placement or parole.  Nor does the Seventh Circuit's decision in *Russell* provide definitive guidance in assuming without deciding that a prisoner's due process rights were implicated in that case.

the case cannot be resolved on the ground that requiring Knowlin to participate in alcohol or drug treatment was reasonably related to a legitimate penological interest.  On the contrary, the record here suggest the requirement for AODA treatment was repeatedly and cavalierly imposed and then dropped.

12

While government officials may be held liable under § 1983 under novel factual circumstances, this is only true when the case law or constitution itself applies with "obvious clarity" to the facts of the present case. *Michael C. v. Gresbach*, 526 F.3d 1008,1017 (7th Cir. 2008) ("[A] general constitutional rule already identified may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.") That is simply not the situation here.

## II. Nature of Treatment

Even it is assumed that *Sundby*, *Bollig* or *Russell* provided a clear rule to be applied in this case, Knowlin faces several other hurdles that he cannot overcome. As an initial matter, Knowlin has not met his burden to show that the "treatment" at issue would satisfy the standard in *any* of those cases. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (because plaintiff has burden of proof at trial, plaintiff has burden at summary judgment to make sufficient showing of evidence for each essential element of his case). In his briefs and proposed findings of fact, Knowlin seems to be asserting that the AODA program qualifies under *Cruzan* and *Russell* as "medical treatment," but he fails to define that term or adduce admissible evidence in support of his argument.

In his proposed findings of fact, Knowlin cites a document stating that the Department of Corrections' AODA programs are "consistent with community recognized standards for AODA treatment," Plt.'s PFOF ¶ 19, dkt. #39 (citing Plt.'s Decl., exh. 9), and another document stating that the program uses "fact sheets" that "list the mental disorders that are caused by substance dependence/substance abuse," *id.* at ¶30 (citing Plt.'s Decl., exh. 18). These

13

facts are undisputed, but they do not shed any light on whether the department's AODA

program constitutes "medical treatment" in that neither identifies the actual content of any

AODA program of the DOC.   The first fact is simply uninformative regardless of what is meant

by "community recognized standards"; the second is about the nature of the addiction, not the

type of treatment that is provided in the program.

In another proposed finding of fact, Knowlin describes a conversation he had with

Melinda Derus, the unit manager at Jackson Correctional Institution:

> In October 2009, Ms. Derus had a personal interview with me for AODA
> re-screening (Plaintiff's Declaration, ¶ 33).   She informed me that the
> prerequisite for admission into AODA program requires an individual to
> be diagnosed as substance dependent/substance abuse per the American
> Psychiatric Association: Diagnostic and Statistical Manual of Mental
> Disorders ("DSM-IV").   *Id.*  She informed me that the UNCOPE tool is
> also used for AODA screening to determine if alcohol and drug
> programming is needed for me.   She told me that an assessment of
> alcohol/drug use one year prior to me being incarcerated along with many
> other factors from my history are used to determine a result to the
> UNCOPE.      *Id.*     She informed me also that substance
> dependence/substance abuse is [a] psychiatric disorde[r] per the DSM-TR.
> *Id.*  She told me that if I was admitted into the AODA program, I must
> participate in behavior modification as treatment in the group and during
> her one-on-one counseling of me.

Plt.'s PFOF ¶32, dkt. #39.

Most of this proposed fact has nothing to do with the content of the AODA program

(except the last sentence, a statement which Derus denies ever making).   Derus Aff. ¶ 5, dkt.

#45. Even if we assume that Knowlin's recollection is correct, he cannot rely on a statement by

Derus because it is hearsay.   In other words, Knowlin may have personal knowledge of what he

believes Derus *said*, but her statement does not give him personal knowledge of the content of

the program. Fed. R. Civ. P. 56(e)(1) ("affidavit[s] must be made on personal knowledge"); *see*

14

*also Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir.1991) (en banc) (at summary judgment, party's averment is not admissible unless it is "grounded in observation or other first-hand personal experience").[6]  Further, Knowlin offers no averments in his declaration setting forth any knowledge he acquired about the program from his own participation in it.

In his opening brief, Knowlin also asks the court to take judicial notice of the fact that "substance dependence/substance abuse are psychiatric disorders." Plt.s' Br., dkt. #38, at 6.  But the relevant question is not how drug or alcohol addiction is classified; it is how the department treats the addiction.  In his reply brief, Knowlin says that "[t]he DOC alcohol and drug programs are certified as Day treatment service under DHS § 75.12(1)." Plt.'s Reply Br., dkt. #53, at 1-2.  He then quotes language from the regulation defining a "Day treatment service" as a "medically monitored" treatment program.   This syllogism fails because he cites no evidence to support a conclusion that the DOC alcohol and drug program is a "day treatment service" within the meaning of the regulation.   Knowlin may be asserting that the reference to "community standards" in the document he cites is a reference to the regulation, but that document makes no such connection.

Because Knowlin offers no admissible evidence about the content of the AODA program, he cannot show that the treatment was an atypical or significant hardship, that it was qualitatively different from ordinary conditions of confinement, that it involved "medical" treatment, or that it was a sufficiently severe "mental intrusion" to qualify as a deprivation of

---

[6]  Derus is not a party to suit, nor is her employer the Department of Corrections. Even if DOC were a defendant, Derus's position as a Unit Manager and Independent Clinical Supervisor would be unlikely to overcome a hearsay objection to her out-of-court statements as an admission of a party opponent.

liberty under the Due Process Clause.

Simply knowing that "treatment" of some kind was provided cannot be enough to meet the standard because the meaning of the term is too varied and subjective. *Cf. Ghashiyah v. Frank*, 07-C-308-C, 2007 WL 5497186, *2 (W.D. Wis. Aug. 14, 2007) (allegation that prisoner was transferred to "supermax" prison not enough to show liberty interest under due process clause, even though Supreme Court had made that determination with respect to one "supermax" prison; prisoner must describe particular conditions at his prison). If that were sufficient, any effort by the prison to rehabilitate an inmate would be limited by the Due Process Clause. Because almost everything prison officials do could be characterized as an attempt to rehabilitate prisoners, every requirement on a prisoner would become a potential due process violation.

## III. Alleged Requirement of Treatment

Another challenge for plaintiff is to connect each defendant with an injury that provides the basis for a suit under § 1983. Plaintiff's injury could be classified in two ways: (1) the AODA treatment itself; or (2) the consequences he suffered as a result of failing to complete treatment. Both possibilities lead Knowlin's claim to a dead end.

To the extent the AODA treatment is the injury, a potential problem is that Knowlin was not enrolled in the program until he *agreed* to participate, raising the question whether it is appropriate to classify the treatment as an injury at all.[7] The prisoner or patient in each of the

---

[7] In fact, it is not even clear whether Knowlin was subjected to AODA treatment. The parties agree that plaintiff was "enrolled" in a program for a short time in August and September 2008, but neither side proposes any facts stating expressly that Knowlin actually

16

cases Knowlin relies upon was forced to undergo a particular form of treatment without *any* choice in the matter.

Knowlin maintains he had no choice but to agree to treatment, because refusing to do was adversely affecting his custody classification and his parole eligibility. With respect to the latter, it is undisputed that program review committee told plaintiff that he could not be paroled until he completed the AODA program. Defendants do not deny that Knowlin's failure to complete the AODA program could have these effects, but rather argue that participation in the program cannot be deemed "mandatory" because the Due Process Clause does not give prisoners a right to "discretionary parole." Dfts.' Br., dkt. #29, at 3 (citing *Board of Pardons v. Allen*, 482 U.S. 369, 378 n.10 (1987). This argument makes no sense. Whether a prisoner has a "right" to something does not necessarily affect its power to coerce. To the extent withholding parole compels a prisoner to accept treatment, it would likely make little difference to the prisoner whether he was being denied "discretionary" or "mandatory" parole.

If it is assumed that plaintiff did not have a true choice in the matter, the next question is whether *defendants* may be held liable for "forcing" Knowlin to participate in treatment. The answer to that question is no. Defendant Heise had no involvement whatsoever in determining Knowlin's need for treatment.[8] Defendants Wurl-Koth's and Konitzer's sole involvement was

---

*began* treatment.

[8] Knowlin argues that defendant Heise may be held liable because he "ha[s] the dut[y] to respond to prisone[r] appeals as set forth Wisconsin Admin Code § DOC 302.18(2), regarding programs being recommended for them." Plt.'s Br. in Opp., dkt. #48, at 10. Even if this is true, however, Knowlin has adduced no evidence or even alleged that Heise *did* decide any appeal he filed. Without evidence that Heise had actual knowledge of Knowlin's problem, Heise cannot be held liable under 42 U.S.C. § 1983. *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999).

17

refusing to remove AODA treatment as a "need" for Knowlin. Wurl-Koth and Konitzer did not make the initial determination that Knowlin needed AODA treatment. Rather, they refused to overrule someone else's determination based on limited information available to them.

Thus, the most that Knowlin could show is that Wurl-Koth and Konitzer were negligent in failing to discover that the initial determination was incorrect. This negligence -- and that of many others within the department, as well as plaintiff Knowlin's (the latter arguably understandable given the run around he was facing on his need for treatment) -- should be embarrassing. But because "negligence is not actionable as a due process violation," *Gayton v. McCoy*, 593 F.3d 610, 623 (7th Cir. 2010), defendants' failure is not enough to sustain a claim under § 1983.

Alternatively, plaintiff's injury could be the adverse consequences he suffered as a result of failing to complete treatment. This view seems to make sense in the context of this case because Knowlin's primary concern has always been to avoid those consequences. That is, Knowlin did not seem to mind participating in the treatment as much as he minded that failing to complete it was hindering his chances at parole. Framed this way, Knowlin's claim may be similar to one presenting a retaliation theory: "An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution. . . . even if the adverse action does not independently violate the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). *See also Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987) ("It is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper."). Or, Knowlin's claim might be appropriately characterized as one asserting that the government has placed an "unconstitutional condition" on the receipt of a discretionary benefit. *See U.S. v. Cranley*, 350 F.3d 617, 620 -21 (7th Cir. 2003).

This view presents its own problems. First, if Knowlin's injury is that he was denied parole, this raises the question whether his claim is even cognizable under 42 U.S.C. § 1983. *See Prieser v. Rodriguez*, 411 U.S. 475, 488-90 (1973)(habeas corpus under § 2254 is exclusive remedy for state prisoner seeking immediate or speedier release). Knowlin says that his failure to complete the AODA program was effecting his custody classification and "Inmate Risk Assessment" as well, but he does not identify any particular instance in which he was housed in harsher conditions because of his failure to complete the drug and alcohol program and he does not explain how a different "risk assessment" rating had an adverse effect on him.

In any event, viewing Knowlin's injury this way runs up against the same problem of the defendants' lack of personal involvement. Even if it would effectively violate due process rights to retaliate against a prisoner for failing to complete unneeded treatment, the proper defendants on such a claim would be those prison officials who "retaliated" against him, or perhaps those who wrongfully withheld a benefit. Knowlin has not, however, adduced any evidence that the named defendants were involved in his parole decisions, took any adverse actions against him for failing to complete treatment or withheld any benefit. Thus, regardless how one characterizes Knowlin's claim, he cannot show that any of the defendants violated his constitutional rights.

## V.     Request for Injunctive Relief

With respect to Knowlin's remaining claim to injunctive relief, it is questionable whether a real controversy still exists. The unit manager at Jackson Correctional Institution removed AODA as a treatment "need" for Knowlin in October 2009, which is exactly what Knowlin asked

for in his complaint.  Cpt., dkt. #1, at 6 (asking for injunction "[t]o remove the AODA treatment program as a need for the plaintiff").  Knowlin identifies no reason to believe this will change unless new evidence arises establishing a need for AODA treatment, much less that an injunction against these particular defendants would serve any purpose.  As noted above, defendants Wurl-Koth and Konitzer became involved only because Knowlin complained to them.  Knowlin does not identify any circumstances under which these defendants would overrule the unit manager's decision that Knowlin may forgo AODA treatment; it is not even clear whether they have the power to do so.

When a prisoner has received what he is asking for and there is no evidence to suggest that prison officials will change their mind, there is reason to conclude that any claim for injunctive relief is moot.  *Nelson v. Miller*, 570 F.3d 868, 882-83 (7th Cir. 2009).  Moreover, defendant Heise or his successor are now on notice that Mr. Knowlin has already run a gamut of administrative errors.  Any repeat would be inexcusable.


ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Julianne Wurl-Koth, Mark Heise and Gerald Konitzer, dkt. #28, is GRANTED, and the motion for summary judgment filed by plaintiff Lee Knowlin, dkt. #37, is DENIED.  The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 9th day of September, 2010.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge